IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DESMOND MARTIN, | : | |
| Plaintiff, | : | 1:12-cv-2410 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| GEARHART, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM

### September 30, 2016

Plaintiff Desmond Martin ("Plaintiff" or "Martin") initiated the above civil rights action pursuant to 42 U.S.C. § 1983 on December 3, 2012.  (Doc. 1).  The matter is proceeding *via* an Amended Complaint (Doc. 19) filed on June 6, 2013. The following civil rights claims against Corrections Activist Specialist Richard Davis ("Davis"), and Corrections Officers Gearhart and Sherman remain:  Eighth Amendment excessive use of force claim against Defendant Davis, First Amendment retaliation and denial of access to the courts claims against Defendant Gearhart, and First Amendment retaliation and Eighth Amendment conditions of confinement claims against Defendant Sherman.

Presently pending, and ripe for disposition, are two separate motions (Docs. 110, 115) for summary judgment pursuant to Federal Rule of Civil Procedure 56. Martin seeks an entry of partial summary judgment against Defendant Gearhart; Defendants Davis, Gearhart and Sherman move for summary judgment against

Martin. For the reasons set forth below, Martin's motion will be denied and summary judgment will be granted in favor of Defendants Davis, Gearhart and Sherman.

## I.   <u>STANDARD OF REVIEW</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex.* at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the

movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.  STATEMENT OF MATERIAL FACTS

Martin is a state inmate who has been incarcerated at the State Correctional Institution at Rockview ("SCI-Rockview") since 2008.  (Doc. 116, ¶ 2; Doc. 121, ¶ 2).

### A.  Eighth Amendment Excessive Use of Force Claim

Defendant Davis is employed by the Pennsylvania Department of Corrections ("DOC") as a Corrections Activities Specialist ("CAS").  A CAS is responsible for developing, coordinating and supervising inmate recreational activities.  (Doc. 117-3, ¶ 3).  A CAS is not considered a corrections officer and, consequently, is not issued any defensive equipment other than a handheld radio and whistle.  (*Id.* at ¶ 4).

On April 7, 2012, Davis was assigned to supervise approximately thirty inmates in the gymnasium at SCI-Rockview.  (Doc. 116, ¶¶ 5, 7; Doc. 121, ¶¶ 5,7).  He was unarmed and had no defensive equipment or protective devices.  (*Id.* at ¶ 6; *Id.* at ¶ 6).  He had a whistle in his possession; it is unclear whether he had a hand radio.  (*Id.*)

Martin was among the inmates in the gymnasium participating in an inmate "championship" intramural basketball game.  (Doc. 116, ¶ 4; Doc. 121,  ¶ 4).  The

game concluded at approximately 10:30 a.m.; Martin's team lost.  (*Id.* at ¶ 8; *Id.* at ¶ 8).  Some of the inmates on Martin's team began arguing with the inmate referees, claiming that they had been cheated.  (*Id.* at ¶ 9; *Id.* at ¶ 9).  Davis intervened and told the inmates that it was just a game.  (*Id.* at ¶ 10; *Id.* at ¶ 10).  Martin became argumentative and refused Davis's order to leave the gym.  (Doc. 116, ¶¶ 11-12).  Martin states that Davis began yelling and ordering him to "get the f*** out of my gym."  (Doc. 121, ¶ 12).  Martin contends that when he asked Davis for his pass, Davis threw it on the floor and then issued the second order to leave the gym.  (Doc. 121, ¶ 13).  Martin refused a second order to leave the gym.  (Doc. 116, ¶ 13).  His refusal to retrieve the pass from the floor resulted in Davis grabbing his shirt and pushing, pulling, and shoving him towards the gym door.  (*Id.* at 14).   Davis states that Martin commenced swearing at him and attempting to loosen the hold he had on Martin's shirt.  (Doc. 116, ¶ 15).  When Martin reached the door between the gymnasium and the culinary building corridor, Davis's "pushing coupled with the incline" in the floor caused Martin to twist his ankle and fall to the floor.  (Doc. 116, ¶ 16, Doc. 121, ¶ 16).  Thereafter, when Martin attempted to reenter the gym, Davis shoved him and he ran into the metal gymnasium door and injured his shoulder.  (*Id.* at 17-19; *Id.* at 17-19).  Martin concedes that Davis did not punch, kick, or otherwise strike him during the incident.  (*Id.* at 21; *Id.* at 21).

Once in the corridor outside the gym , Martin refused to comply with Davis's order to produce his inmate identification card.  (*Id.* at 22-23; *Id.* at 22-23). Davis contends that he then signaled for a corrections officer to assist him.  (Doc. 116, ¶ 24).  Conversely, Martin asserts that he requested the assistance of a corrections officer.  (Doc. 121, ¶ 24).  Sergeant Powell assisted in calming Martin; he then escorted Martin out of the culinary building.  (*Id.* at 26-27; *Id.* at 26-27). Upon leaving the culinary building, Martin reported to the shift commander, Captain Irwin, and Corrections Officer Fink, that Davis improperly "grabbed" and "assaulted" him.  (*Id.* at 28; *Id.* at 28).   He also reported that he refused to give Davis his identification card.  (*Id.*; *Id.*).

Thereafter, Martin walked to the medical department without assistance. (*Id.* at 33).   He complained that he hurt his neck, right shoulder and right ankle. (*Id.* at 34).   A medical examination revealed no swelling, lacerations, abrasions, or bruising on his neck, shoulder or ankle.  (*Id.*)  Although he exhibited some limping, his limping was noted as inconsistent. (*Id.*)

Approximately an hour after Martin left the gymnasium, Davis submitted to the shift commander's office a proposed inmate misconduct charging Martin with threatening an employee, using abusive language, refusing to obey an order, and lying to an employee,.  (*Id.* at 30; *Id.* at 30).  Pursuant to the Inmate Discipline policy, the shift commander, in this instance Captain Irwin, must review and

approve all misconducts prior to service on the inmate.  (*Id.* at 31; *Id.* at 31).

Captain Irwin did not inform Davis that Martin claimed that Davis assaulted him

during the incident.  (Doc. 116, ¶ 32).  Captain Irwin approved the misconduct and

Martin was placed in pre-hearing confinement.  (Doc. 116, ¶ 35; Doc. 121 ¶ 35).

Following a misconduct hearing on April 13, 2012, Martin was found guilty of

using abusive language and refusing to obey an order; the charges for threatening

an employee and lying to an employee were dismissed.  (*Id.* at 37; *Id.* at 37).  As a

sanction, Martin received ninety days of disciplinary custody time.  (*Id.*; *Id.*).

Martin's appeals of the misconduct hearing officer's findings were unsuccessful.

(*Id.* at 38; *Id.* at 38).

On April 25, 2012, Martin filed Grievance 410104 alleging that he was

abused by Defendant Davis on April 7, 2012. (*Id.* at 41; *Id.* at 41; Doc. 117-6, p.

6).  The Department of Corrections' Inmate System Policy, DC-ADM 804,

provides for a three-tiered grievance system.  (*Id.* at 42-43; *Id.* at 42-42).  Pursuant

to DC-ADM 804, an inmate must submit a grievance within fifteen working days

of the event on which the grievance is based.  (*Id.* at 44; *Id.* at 44).

Because Martin's grievance raised allegations of abuse, it was handled in

accordance with the Department's "Inmate Abuse Allegation Monitoring Process",

DC-ADM 001.  (*Id.* at 46; *Id.* at 46).  In those instances, the Initial Review

Response is completed once the abuse investigation is completed and received by

the assigned Grievance Officer.  (*Id.*; *Id.*)  The inmate is then permitted to appeal

any findings from the investigation pursuant to DC-ADM 804.  (*Id.*; *Id.*)  An

inmate who is dissatisfied with the initial review decision is permitted to appeal to

the Superintendent within fifteen working days of the initial review decision.  (*Id.*

at 47; *Id.* at 47).  Final review consists of filing an appeal within fifteen working

days of the date of the Superintendent's decision with the Secretary's Office of

Inmate Grievances and Appeals ("SOIGA"). .  (*Id.* at 48; *Id.* at 48).

Martin was notified on May 21, 2012, that the grievance response deadline

for Grievance 410104 was extended pending an investigation into his abuse

allegations.  (*Id.* at 49; *Id.* at 49).  The investigation was assigned to Lieutenant

Foster, a security lieutenant at SCI-Rockview.  (Doc. 116, ¶ 50).  On July 1, 2012,

Martin requested a status of the investigation *via* an official inmate grievance form,

complaining that he had sent "a few request[s]" to Lt. Foster but had received no

response. (Doc. 117-6, p. 8).  On July 5, 2012, he was notified by the Facility

Grievance Coordinator that "the grievance is still under investigation.  You may

not grieve the length of the investigation."  (*Id.* at 9).

Based on the witness interviews, medical records, and video, that allegations

of abuse were deemed unfounded.  (*Id.* at ¶ 52).  The investigation was

subsequently reviewed and approved.  (*Id.*).  These findings were communicated to

Martin by the security captain in the Initial Review Response to Grievance 410104,

dated October 24, 2012.  (Doc. 116, ¶¶ 53-54;  Doc. 121, ¶¶ 53-54).  Martin timely

appealed this decision to the Superintendent on November 6, 2012.  (*Id.* at 55; *Id.*

at 55).  By Appeal Response dated November 29, 2012, the Superintendent upheld

the Initial Review Response stating that "[t]his matter has been investigated and

reviewed in accordance with applicable DOC policy DC ADM 001.  The Office of

Special Investigations and Intelligence has determined your allegations were not

supported by any evidence.  No further action is necessary. Your appeal is denied."

(*Id.* at 56; *Id.* at 56; Doc. 117-6, p. 12; Doc. 121-1, p. 31).  More than three months

later, Martin appealed the Superintendent's decision to the SOIGA and, on March

5, 2013, the appeal to final review was rejected as untimely and for failure to

submit the required documentation.  (Doc. 116, ¶ 58).

> **B.     First Amendment Denial of Access to the Courts and Retaliation Claim Arising Out of Loss of Property**

On December 11, 2009, Plaintiff filed a PCRA petition challenging his

Court of Common Pleas of Philadelphia Count conviction in criminal matter

0009280-2007.  (Doc. 116, ¶ 59; Doc. 121 ¶ 59).  He was appointed counsel and,

on July 21, 2010, Sondra Rodrigues, Esq., entered her appearance on his behalf.

(*Id.* at 60; *Id.* at 60).  On December 6, 2011, Attorney Rodrigues filed a "no merit"

letter in accordance with *Commonwealth v. Finley*, 379 Pa. Super. 390, 550 A.2d

213 (1988) in the Court of Common Pleas for Philadelphia County and served a

copy of the letter on Martin.  (*Id.* at 61, 63; *Id.* at 61, 63; Doc. 117-8, pp 1-5).  The

*Finley* letter notified the court that, after having "engaged in a careful and exhaustive review of the available record," Attorney Rodrigues determined that the issues raised by Martin in his PCRA petition were "either finally litigated without merit." (Doc. 116, ¶ 62; Doc. 117-8, p. 4). In the letter to Martin, Attorney Rodrigues informed him that she was not able to file an amended PCRA petition because the issues he sought to raise "were either finally litigated on direct appeal or without merit." (Doc. 116, ¶ 64; Doc. 121 ¶ 64). She also informed him that if the Court files a Notice of Intent to dismiss he had the option to file a response to the Finley letter within twenty days of receiving the Notice of Intent to dismiss and that, if the case was dismissed despite any response he may file, he had the right, within thirty days, to enter his own appearance or hire an attorney to represent him on appeal. (*Id.*; *Id.*). Also on December 6, 2011, Attorney Rodrigues filed a motion to withdraw as counsel based upon her *Finley* letter stating that after an examination of the record she "determined that a collateral appeal (PCRA) would be wholly frivolous as the defendant's [claims] are either finally litigated or without merit, and there appears to be no other issues to raise on his behalf." (Doc. 116, ¶ 65; Doc. 117-10, ¶ 3).

On April 18, 2012, the PCRA petition was listed for formal dismissal. (Doc. 116, ¶ 68; Doc. 121, ¶ 68). On April 20, 2012, the trial court notified Martin that his PCRA petition would be denied/dismissed in twenty days. The court informed

him that, although no response was required, any response was due within twenty calendar days of the Notice date.  (*Id.* at 69; *Id.* at 69).

On April 20, 2012, Martin was placed in the Restricted Housing Unit ("RHU") to serve ninety days disciplinary custody imposed following the finding of guilt on certain charges contained in the misconduct involving the April 7, 2012 gym incident with Defendant Davis.  (Doc. 116, ¶ 70; Doc. 122, ¶ 70).  The property in Martin's cell in general population was packed and transferred to the RHU.  (Id. at 71; *Id.* at 71).   On April 22, 2012, Martin was present while Officer Sherman conducted the property inventory.  (*Id.* at 72-73; *Id.* at 72-73).  It was documented that a pair of Martin's white Nike sneakers was missing.  (*Id.* at 74; *Id.* at 74).  At some point after Martin inventoried his property on April 22, 2012, Officer Gearhart retrieved sneakers, a washtub, and paperwork from Martin's former cell, transferred the items to the Property Room, and deposited them for storage.  (Doc. 116, ¶ 76).  He had no further involvement with Martin's property.  (*Id.*)  Martin contends that Gearhart "took the plaintiff's property to the property room, threw it away and had no further involvement with the property after that time."  (Doc. 121, ¶ 76).

On June 28, 2012, Martin was released from the RHU and returned to general population.  (*Id.* at 80; *Id.* at 80).  His property was inventoried on that date

and he noted that he was missing his "Legal work" and "white sneakers," *inter alia.* (Doc. 116, ¶ 81; Doc. 121, ¶ 81; Doc. 121-1, pp 46-47).

On July 3, 2012, Plaintiff filed Grievance 418651 alleging that he was missing the following personal property items: a washtub, white Nike sneakers, 1 tank top, 1 thermal top, a t-shirt, 1 ½ pairs of socks, 2 mirrors, a razor, and a commissary towel. (Doc. 116, ¶ 82; Doc. 117-6, p. 19). He did not allege that he was missing any legal paperwork. (*Id.*) Martin's grievance was investigated and, on July 10, 2012, he was informed that he would be reimbursed for the pair of sneakers, which had been noted on the inventory sheet as missing. (Doc. 116, ¶ 83; Doc. 121, ¶ 83). On July 19, 2012, after the receipt of the initial review response, Martin filed what he describes as a supplement to his grievance for the purpose of identifying Defendant Gearhart as the individual who removed his property from his cell, and to include the loss of legal work. (Doc. 121, ¶ 84; Doc. 117-6, p. 21).

Martin appealed to the Superintendent and, in his September 18, 2012 decision, the Superintendent indicated that he spoke to Defendant Gearhart and that he confirmed that Gearhart carried a pair of sneakers, a washtub, and some legal paperwork from Martin's cell to the Property Office. (Doc. 116, ¶ 85; Doc. 121 ¶ 85; Doc. 117-6, p. 22). The Superintendent overturned the decision to reimburse Martin for the sneakers because there was no evidence that he

legitimately possessed the sneakers, but allowed him to be reimbursed for the missing wash tub.  (*Id.*)

Martin appealed to SOIGA on September 24, 2012.  (Doc. 116, ¶ 86; Doc. 121, ¶ 86).  Therein he appeals the decision with regard to his personal property and states, "…my PCRA was dismissed because my Rebuttal was in my legal work a yellow manilla [sic] envelope full about 40 pieces of paper missing."  (Doc. 117-6, p. 23).  In rejecting this portion of the appeal the Chief Grievance Officer observed that "You only indicate in your appeal to final review that 'your rebuttal was in [your] legal work a yellow manilla [sic] envelope full about 40 pieces of paper missing.'  As indicated by Superintendent Lamas, you will not be reimbursed for the legal work as there is no way to determine the content or the amount."  (Doc. 117-6, p. 26; Doc. 121-1).  DC-ADM 804 clearly states that "[o]nly an issue that was raised for Initial Review...may be appealed."  (Doc. 117-7, p. 24).

No grievance was filed alleging harassment or retaliation by Defendant Gearhart.  (Doc. 116, ¶ 88).

Martin appealed the dismissal of his PCRA to the Pennsylvania Superior Court on June 14, 2012.   (Doc. 116, ¶ 89; Doc. 121, ¶ 89).  The trial court issued an opinion pursuant to PA. R.A.P. 1925 in support of the dismissal of Martin's

PCRA petition.   (*Id.* at 90; *Id.* at 90).   On September 26, 2014, the Pennsylvania Superior Court affirmed the PCRA court's order of dismissal. (*Id.* at 91; *Id.* at 91).

### C. Eighth Amendment Conditions of Confinement and Retaliation Claims Arising Out of Water Shut Off

While housed in the Restricted Housing Unit ("RHU"), Martin was assigned to cell A29.  (Doc. 116, ¶ 93; Doc. 121, ¶ 93).  During the morning of June 11, 2012, the water in Martin's cell was turned off.   (*Id.* at 94; *Id.* at 94).  Martin did not witness who shut the water off; Defendant Sherman was not responsible for shutting off the water.  (*Id.* at 95; *Id.* at 95).  Defendants contend that the water was shut off due to a plumbing issue.  (Doc. 116, ¶ 94)  Martin asserts it was deliberately turned off.  (Doc. 121, ¶ 94).  He states that at approximately 8:00 a.m., when he informed Defendant Sherman that the water had been off for about two hours, Sherman laughed and replied "get Rick Davis to do it."  (Doc. 116, ¶ 96; Doc. 121, ¶ 96; Doc. 121-1, p. 5, ¶ 5).  He also attaches a declaration from his cellmate, Aaron Pitchford, who states that Sherman told Martin "you should've kept your mouth close[d].  Officer Sherman began laughing at Martin when he told him our water was off and said 'get rick to do it'."  (Doc. 121-1, p. 54).  Defendant Sherman does not recall Martin informing him that his water was off.  (Doc. 116, ¶ 100).

According to Defendants, Martin was permitted to shower that morning, officers manually turned the water on intermittently to allow him to wash his hands

and flush the toilet, and he was given juice packets with his meals.  (Doc. 116, ¶¶ 97, 99).  Martin indicates that the water was turned off after showers on the morning of June 11, 2012, there was no water until the following day, and the juice packets were useless because he had no water with which to mix them.  (Doc. 121, ¶¶ 97, 99).  Water was restored the following day.  (Doc. 116, ¶ 101; Doc. 121 ¶ 101).

On June 14, 2012, Martin filed Grievance 416153 raising the water shut off issue.  (*Id.* at 102; *Id.* at 102).  The grievance was assigned to the Unit Manager for investigation and response.  (*Id.* at 103; *Id.* at 103).  The grievance was denied on July 6, 2012.  (Doc. 116, ¶ 104).  Martin appealed to the Superintendent on August 9, 2012, and, by decision issued September 18, 2012, the initial review decision denying the grievance was upheld and the appeal was denied.  (Doc. 116, ¶ 105; Doc. 121 ¶ 105).  Defendants contend that Martin failed to appeal the Superintendent's decision to SOIGA.  (Doc. 116, ¶ 106).  Martin asserts that he filed an appeal to SOIGA but never received a response.  (Doc. 121 ¶ 106; Doc. 121-1, p. 62).

## III.  **DISCUSSION**

Martin brings this civil rights action pursuant to 42 U.S.C. § 1983.  Section 1983 of Title 42 of the United States Code offers private citizens a cause of action

for violations of federal law by state officials.  *See* 42 U.S.C. § 1983.  The statute

provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress. . . .

*Id*.; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v.

Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a

plaintiff must allege "the violation of a right secured by the Constitution and laws

of the United States, and must show that the alleged deprivation was committed by

a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A.    Eighth Amendment Excessive Use of Force Claim

Martin's sole claim against Defendant Davis, an Eighth Amendment

excessive use of force claim, arises out of an April 7, 2012 incident in the

gymnasium at SCI-Rockview.

### 1.    Exhaustion of Administrative Remedies

Defendants seek summary judgment on the grounds that Martin failed to

fully exhaust his administrative remedies, as required by 42 U.S. C. § 1997e(a),

with respect to the excessive use of force grievance filed against Davis.  The Prison

Litigation Reform Act of 1996 (the "PLRA") "mandates than an inmate exhaust

'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.").  The text "suggests no limits on an inmate's obligation to exhaust– irrespective of 'special circumstances.'" *Id.* "And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account.  *See Miller v. French*, 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (explaining that "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion")." *Id.* at 1856-57

Significantly, "the PLRA contains its own, textual exception to mandatory exhaustion," *i.e.* the PLRA requires exhaustion of "available" administrative remedies.  *Id.* at 1858.  "Available" is defined as "capable of use for the accomplishment of a purpose" and that which "is accessible or may be obtained." *Id.* at 1858-59, quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001).  There are three instances in which administrative remedies are unavailable.  "First, as *Booth* made clear, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end– with officers unable or consistently unwilling to provide relief to aggrieved

inmates." *Id.* at 1859.  "Next an administrative scheme might be so opaque that it

becomes, practically speaking, incapable of use." *Id.*  Finally, administrative

remedies are unavailable "when prison administrators thwart inmates from taking

advantage of a grievance process through machination, misrepresentation, or

intimidation." *Id.*

The PLRA also mandates that inmates "properly" exhaust administrative

remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93

(2006).  "Proper exhaustion demands compliance with an agency's deadlines and

other critical procedural rules because no adjunctive system can function

effectively without imposing some orderly structure on the course of its

proceedings." *Id.* at 90–91.  Such requirements "eliminate unwarranted federal-

court interference with the administration of prisons, and thus seek[ ] to 'affor[d]

corrections officials time and opportunity to address complaints internally before

allowing the initiation of a federal case.' " *Id.* at 93 (quoting *Porter v. Nussle*, 534

U.S. 516, 525 (2002).).

The "exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether

they allege excessive force or some other wrong." *Woodford*, 548 U.S. at 90–92.

"Proper exhaustion demands compliance with an agency's deadlines and other

critical procedural rules because no adjunctive system can function effectively

without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91.  The exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal." *Id.* at 83; *see also Spruill v. Gillis*, 372 F.3d 218, 228–29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion).  "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 211–212 (2007).

Finally, whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts.  *See Small v. Camden County*, 728 F.3d. 265, 268 (3d Cir. 2013); *see also Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010).

Defendants argue that Martin failed to fully comply with the multi-step Inmate Grievance System Policy, DC-ADM 804, in that he neglected to timely appeal the Superintendent's decision to the SOIGA.  Martin first contends that Defendant waived the failure to exhaust defense.  (Doc. 120, p. 5).  Martin is mistaken.  Davis clearly raised the affirmative defense of failure to exhaust administrative remedies in his Answer to the Amended Complaint.  (Doc. 56, p. 9).

Martin concedes that he failed to file a timely final appeal with SOIGA in accordance with DC-ADM-804.  However, he seeks to excuse his noncompliance by arguing that the administrative remedy procedure was essentially unavailable because he was prevented by prison authorities from pursing the prison grievance process.  (Doc. 120, p. 10, quoting *Brown v. Croak*, 312 F.3d 109, 112-113 (3d Cir. 2002) and citing *Ray v. Kertes*, 285 F3d 287 (3d. Cir. 2002).  His argument is two-fold.

He first argues that the DOC's delay in resolving his grievance rendered the grievance process unavailable.  (*Id.* at 9).  Martin's argument is belied by the record.  Martin filed his official inmate grievance against Davis on April 25, 2012; it was assigned Grievance Number 410104.  (Doc. 117-6, p. 6).  On May 21, 2012, in accordance with DC-ADM 804, Martin was notified that an extension to respond to the grievance was necessary "in order to appropriately investigate and respond to your allegations of abuse.  Staff has been authorized to extend the response time in accordance with DC-ADM 001."  (Doc. 117-6, p. 7).  When Martin filed a grievance on July 1, 2012, inquiring about the status of the investigation, he received a prompt response from the Facility Grievance Coordinator which informed him that the grievance was still under investigation and that grieving the length of the investigation was not permitted. (*Id.* at 8-9).  He was notified on October 24, 2012, that his allegations of abuse were unfounded

and, consequently, his grievance was denied.  (*Id.* at 10).   He immediately

appealed the grievance to the Superintendent. Although it is recognized that the

grievance process can be rendered unavailable when a prison fails to timely

respond to a grievance in accordance with its own procedural rules and then

repeatedly ignores an inmate's request for a decision, there is simply no indication

that the institution failed to comply with procedural rules, delayed responding to

Martin's grievance, or repeatedly ignored requests for a decision on the grievance.

*See Robinson v. Superintendent Rockview SCI*, No. 14-2994, 2016 WL 4010438, at

*5 (3d Cir. July 27, 2016).

        Alternatively, he argues that "the only reason his final appeal was untimely

was because the Superintendent informed him that [th]is investigation had no

evidence and '[n]o further action was necessary.'  Plaintiff was informed later [by

a fellow inmate] that he was misled and that he had to appeal."  (Doc. 120, p. 10-

11 (citation omitted); Doc. 121, ¶ 58).  The Superintendent specifically stated as

follows:  "This matter has been investigated and reviewed in accordance with

applicable DOC policy DC ADM 001.  The Office of Special Investigations and

Intelligence has determined your allegations were not supported by any evidence.

No further action is necessary. Your appeal is denied."  (Doc. 117-6, p. 12; Doc.

121-1, p. 31).  Martin fixates on the Superintendent's "no further action" language

in concluding that "this facility has made the grievance procedure unavailable to

21

the plaintiff because the plaintiff listend [sic] to the facility manager and ended his action." (Doc. 12, p. 10). This argument falls short of the recognized instance where the remedies are unavailable because "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859. Accordingly, Defendant Davis is entitled to an entry of summary judgment based on Martin's failure to exhaust available administrative remedies.

2. <u>Merits</u>

Even had Martin cleared the administrative exhaustion hurdle, Defendant Davis would be entitled to an entry of summary judgment. The unnecessary and wanton infliction of pain is considered cruel and unusual punishment under the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). When evaluating excessive use of force claims, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. Factors to be considered in the analysis include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of a forceful response." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir.

2000).  "[A]n inmate who complains of a push or a shove" that causes no discernible injury has no right to recovery. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) (stating that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

The undisputed facts demonstrate that Martin's conduct on April 7, 2012, was disruptive and threatened the orderly operation of the prison and the safety of the inmates gathered in the gymnasium.  This is corroborated by the fact that Martin was found guilty of misconduct in the form of using abusive language during the incident and refusing to obey Davis's order.  Martin's conduct necessitated the application of force and, all indications are that the amount of force applied, essentially grabbing, pushing and shoving, was reasonable and, at most, caused minor injury to Martin.  The record clearly demonstrates that Davis applied a measured degree of force in a good-faith effort to maintain and restore discipline, not to maliciously and sadistically cause harm to Martin.  Accordingly, even had Martin exhausted his administrative remedies, an entry of summary judgment on behalf of Defendant Davis would be warranted.

### B. First Amendment Denial of Access to the Courts and Retaliation Claims Arising Out of Loss of Property

Martin contends that Defendant Gearhart violated his First Amendment rights in two respects.  First, Defendant Gearhart's disposal of his legal property

denied him his right of access to the courts because it prevented him from responding to a state court order notifying him of the dismissal of his PCRA petition.  Second, he avers that Gearhart infringed on his right to grieve a wrong when, in retaliation for his utilization of the Inmate Abuse Hotline, he disposed of Martin's property.

Defendants contend that they are entitled to an entry of summary judgment on the First Amendment denial of access to the courts claim because Martin raised the issue for the first time in his appeal of Grievance 418651 to the SOIGA.  (Doc. 119, p. 13).   This position is wholly supported by the record.  Martin first links the loss of his property to the dismissal of his PCRA in his appeal of Grievance 418651 to the SOIGA.  Therein he states "…my PCRA was dismissed because my Rebuttal was in my legal work a yellow manilla [sic] envelope full about 40 pieces of paper missing."  (Doc. 117-6, p. 23) (emphasis omitted). The Chief Grievance Officer rejected this portion of the appeal stating that "You only indicate in your appeal to final review that 'your rebuttal was in [your] legal work a yellow manilla [sic] envelope full about 40 pieces of paper missing.'."  (*Id.* at 26).  DC-ADM 804 clearly states that "[o]nly an issue that was raised for Initial Review...may be appealed."  (Doc. 117-7, p. 24).  Accordingly, Defendants are entitled to an entry of summary judgment on the denial of access to the courts based on Martin's

failure to exhaust administrative remedies.  Martin's motion for summary

judgment on this claim will be denied.

With respect to the retaliation claim, Defendants argue that Martin's failure

to raise the claim in Grievance 418651, or at any time during the administrative

review process bars relief.  The Court agrees.  In his initial grievance Martin

grieves the loss of his property.  (Doc. 117-6, p. 19).  He indicates that, after he

was transferred to the RHU, an unidentified officer removed the property from his

cell.  (*Id.*).  His supplement to the grievance identifies Defendant Gearhart as the

officer who retrieved property from his cell and delivered it to the property room.

Completely absent from the grievance, supplemental grievance, and appeals, is any

reference to any retaliatory conduct.  (*Id.* at 21).  As explained in *Spruill*: "[t]he

purpose of the regulation here [*i.e.*, regarding the initial grievance] is to put the

prison officials on notice of the persons claimed to be guilty of wrongdoing."

*Spruill*, 372 F.3d at 234. *Accord Fortune v. Bitner*, 2006 WL 2796158, *9 (M.D.

Pa. Sept.25, 2006) (stating that "[t]he PLRA exhaustion requirement is satisfied if

the Plaintiff files a grievance and appeals the denial of the grievance to the highest

level possible, giving the prison 'fair notice' of the claim and an opportunity to

remedy it. To provide fair notice of a claim, the plaintiff must allege specific acts

of mistreatment or misconduct and identify the responsible party or parties.").

Martin failed to notify the prison *via* the administrative remedy procedure that he

was pursuing a retaliation claim against Defendant Gearhart.  Consequently, he

failed to exhaust his administrative remedies.  Defendants are entitled to an entry

of summary judgment on the retaliation claim.  Martin's motion for summary

judgment on this claim will be denied.

### C.      Eighth Amendment Conditions of Confinement and First Amendment Retaliation Claims Arising Out of Water Shut Off

Martin alleges that he was subjected him to inhumane conditions of

confinement during the shut off of water to his RHU cell beginning on June 11,

2012, and ending on June 12, 2012, and that the water shut off was in retaliation

for the April 7, 2012 incident involving Defendant Davis.

### 1.      Exhaustion of Administrative Remedies

Defendants seek judgment on the ground that Martin's failure to appeal the

denial of Grievance 416153 to the SOIGA constituted a failure to fully exhaust his

administrative remedies as mandated by the PLRA.  (Doc. 119, p. 13).  Martin

opposes the motion by attaching a copy of his September 28, 2012 appeal to the

SOIGA, which raises the issues of "retaliation and cruel punishment of the

conditions of [his] cell while [he] was in the RHU."  (Doc. 120, p. 11; Doc. 121-1,

p. 62).   He indicates that SOIGA never responded and reasons that SOIGA's

failure to provide him with a response rendered the grievance process unavailable.

(Doc. 120, p. 12).  He "just figured it was denied and pursued the instant action."

(*Id.*)

Defendants misconstrue Martin's position, and, in the process, fail to address the merits of his argument or to dispute the validity or veracity of the September 28, 2012 appeal. Consequently, we are constrained to agree with Martin that SOIGA's failure to respond to his appeal concerning the conditions of his cell and retaliation rendered the administrative review process unavailable to him. *See Small v. Camden Cty.*, 728 F.3d 265, 268 (3d Cir. 2013). *See also Boyd v. Corrections Corp. Of America*, 380 F.3d 989, 996 (6th Cir. 2004) (finding that "administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance"); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (holding "we agree that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable"); *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001) (determining "once [the prison] failed to respond to [the prisoner's written grievance], no further administrative proceedings were 'available' to him"). The merits of each claim will be addressed in turn.

2.    Merits

a.    *Conditions of Confinement*

In addressing the merits, Defendants argue that this claim is without merit because Martin was not denied the minimal civilized measure of life's necessities. (Doc. 119, p. 20). The Eighth Amendment protects prison inmates from cruel and

unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

However, not all deficiencies and inadequacies in prison conditions amount to a

violation of a prisoner's constitutional rights. *Rhodes v. Chapman*, 452 U.S. 337,

349 (1981). Rather, a condition of confinement violates the Eighth Amendment

only if it is so reprehensible as to be deemed inhumane under contemporary

standards or such that it deprives an inmate of minimal civilized measure of the

necessities of life. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson v. Seiter*,

501 U.S. 294, 298 (1991). When an Eighth Amendment claim is brought against a

prison official, it must meet two requirements: (1) the deprivation alleged must be,

objectively, sufficiently serious; and (2) the prison official must have been

deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan*, 511

U.S. 825, 834 (1994). However, only "extreme deprivations" are sufficient to

present a claim for unconstitutional conditions of confinement. *Hudson*, 503 U.S.

at 8–9. Mere negligence or inadvertence will not satisfy the deliberate indifference

standard and cannot constitute a violation of the Eighth Amendment. *Estelle v.

Gamble*, 429 U.S. 97, 105–06 (1976).

Individual liability will be imposed under Section 1983 only if the state actor

played an "affirmative part" in the alleged misconduct. *See Evancho v. Fisher*,

423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195,

1207 (3d Cir. 1998)). When a plaintiff merely hypothesizes that an individual

defendant may have had knowledge of or personal involvement in the deprivation of his or her rights individual liability will not follow. *Atkinson*, 316 F.3d at 271; *Rode*, 845 F.2d at 1207-08. Rather, defendants "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." *Atkinson v. Taylor*, 316 F.3d 257, 271 (3d Cir. 2003); *Rode*, 845 F.2d at 1207-08.

Martin alleges that, upon being notified that his cell was without running water for approximately two hours, Sherman simply laughed and replied "get Rick Davis to do it." (Doc. 121-1, p. 5, ¶ 5). It is his position that Sherman's statement "get Rick Davis to do it" is sufficient to establish his personal involvement. It is undisputed that Sherman was not responsible for turning off his water and the record is devoid of any facts that demonstrate that Sherman had any involvement, beyond a verbal exchange with Martin, in the alleged underlying unconstitutional conduct. Defendant Sherman is therefore entitled to an entry of summary judgment on the conditions of confinement claim.

Significantly, even if Sherman was personally involved in the water shut off, he would still be entitled to an entry of summary judgment because the alleged deprivation is not, objectively, sufficiently serious. Specifically, the temporary deprivation of the lack of running water for a period of approximately twenty-six hours does not constitute a sufficiently serious Eighth Amendment deprivation.

*See, e.g., Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (stating that intolerable conditions lasting twenty-four hours did not constitute Eighth Amendment violation*); Cary v. Rose*, 902 F.2d 37 (7th Cir.1990) (finding conditions that included frequent interruptions in running water did not violate the pre-trial detainee's due process rights); *Jackson v. Kane County*, No. 09 C 4154, 2010 WL 333695, at *2 (N.D. Ill. Jan. 26, 2010);   ("Drawing on judicial experience and common sense, *Iqbal*, 129 S.Ct. at 1950, the court finds that a lack of hot running water in a particular prison cell block, though uncomfortable by itself, is not a serious deprivation of a basic human need."); *Schaeffer v. Schamp*, No. 06–1516, 2008 WL 2553474, at *6 (W.D.Pa. June 25, 2008) (determining that placement in a cell for ten days without mattress, soap, toilet paper, running water, legal supplies, prescription medication, and food other than one meal a day was insufficient to state an Eighth Amendment claim); *Davis v. Lancaster County*, No. 4:05-cv-3238, 2007 WL 2728549, at *6 (D. Neb. Sept. 17, 2007) (dismissing detainee's claims based on the fact that the cell where he was placed for twenty-four hours lacked running water, even though the entirety of the conditions made it impossible for that detainee to wash his body, even including his hands before eating and, in addition, required him to use a toilet "hole" in the floor rather than a toilet that flushed with water.).

###### b.    Retaliation

The First Amendment offers protection for a wide variety of expressive activities.  *See* U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  *See Turner v. Safley*, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate:  (1) that he was engaged in constitutionally protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001) (quoting <u>Allah</u>, 229 F.3d at 225).

With respect to the first and second *Rauser* prongs, "[a]lthough the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting—whether activity is 'protected' or an action is 'adverse' will depend on context.  Standing in his cell in a prison, an inmate is quite limited in what he can say; his government jailor can impose speech-limiting regulations that are 'reasonably related to legitimate penological interests.'  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  The fact that certain conduct

of the plaintiff must be 'protected' in order to state a claim does not change with the setting—what changes is the type of conduct deemed protected in that particular setting." *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999).  The fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates.  *See Pell v. Procunier*, 417 U.S. 817, 822-23 (1974).  Thus, a prison inmate "retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 822.

Martin's allegation that Sherman retaliated against him because he pursued a grievance against Defendant Davis and reported him *via* the Inmate Abuse Hotline implicates conduct protected by the First Amendment sufficient to satisfy the first prong of the *Rauser* test.  *See Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *see also Robinson v. Taylor*, 204 F. App'x 155, 157 (3d Cir. 2006) (finding that the filing an administrative grievance against prison officials is a protected activity for purposes of a retaliation claim).

However, he fails on the adverse action prong.  He is required to demonstrate that, at the hands of Sherman, he suffered some adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  *See Rauser*, 241 F.3d at 333.  Martin identifies the water shut off as the

adverse action taken by Sherman.   However, as noted in the Eighth Amendment section, *supra*, it is undisputed that Defendant Sherman was not personally involved in the decision to shut the water off.

Assuming *arguendo* that the adverse action was at the hands or direction of Defendant Sherman, there is no indication that this action was sufficient to deter him from exercising his constitutional rights. *See Rauser*, 241 F.3d at 333 (*citing Allah*, 229 F.3d at 225).  He continued to pursue grievances and, within approximately five months of the incident, pursued this civil action

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion (115) for summary judgment will be granted and Plaintiff's motion (Doc. 110) for partial summary judgment will be denied.

An appropriate Order will enter.